

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

MARJORIE DONALDSON, PAULETTE
PROVERBS, LATOYA LAWRENCE,
NEELUM MALKANI, and BANKIM
BHARGAVA, on behalf of themselves
and all others similarly situated,

                                         Plaintiffs,

            v.

BANK OF AMERICA CORP., and
BANK OF AMERICA, N.A.,

                                         Defendants.

-------------------------------------------------------------X

Civil Action No.

CLASS ACTION COMPLAINT

JURY TRIAL DEMAND



        Plaintiffs Marjorie Donaldson, Paulette Proverbs, Latoya Lawrence, Neelum Malkani,

and Bankim Bhargava (collectively, "Plaintiffs"), on behalf of themselves and all similarly

situated persons, by and through their undersigned counsel, as and for their Complaint in the

action against Defendants Bank of America Corp. ("BAC") and Bank of America, N.A.

(collectively, "Bank of America" or the "Company"), hereby allege as follows:

## NATURE OF THE CLAIMS

        1.      Bank of America, one of the largest banks in the Country, systemically

discriminates against its employees of color. Bank of America's acts of discrimination have had

the effect of limiting and destroying the careers of hundreds, if not thousands, of employees for

no reason other than the color of their skin. The acts of discrimination committed by Bank of

America are neither isolated nor exceptional, but rather the regular and predictable result of its

policies and practices. Bank of America has regularly discriminated and retaliated against

Plaintiffs and other employees of color who have complained about discrimination. This is not

the first class action complaint filed against Bank of America because of its racist discriminatory

practices. A separate lawsuit concerning a different category of Black employees was recently settled for millions of dollars. In February, 2010, a $60 million race discrimination action was filed by Jack Mitchell, a Premier Client Manager, alleging an allocation apartheid system in which Black employees are assigned to bank branches in low income areas that were demographically predominantly Black. And just weeks ago, an Administrative Law Judge found, in a case that started with an investigation by the U.S. Department of Labor Office of Federal Compliance Programs, that Bank of America discriminated against African-American job applicants. The individual Plaintiffs bring this action on behalf of themselves and all those similarly situated to challenge the pattern and practice of race and color discrimination committed by Bank of America and to stop, once and for all, the discriminatory treatment of people of color as if they lived in the Jim Crow era.

2.     Among Bank of America's discriminatory practices and policies are:

a.   failing to compensate Plaintiffs and other employees of color the same as similarly situated White employees;

b.   failing to promote Plaintiffs and other employees of color at the same rate and on the same terms and conditions as similarly situated White employees;

c.   relying on racial stereotypes by engaging in the practice of "racial steering" in decisions as to promotion, territorial assignments, account assignments, business opportunities, and other terms and conditions of employment;

d.   steering and/or channeling Plaintiffs and other employees of color to less prestigious and less financially rewarding locations;

e.   relying on subjective judgments, procedures and criteria which permit and encourage the incorporation of racial stereotypes and bias by Bank of America's

predominantly White managerial and supervisory staff in making compensation, assignment and promotion decisions;

f.  subjecting Plaintiffs and other employees of color to disparate treatment concerning the use and application of Company policies, procedures, evaluations, and investigations, including repeated, baseless warnings, unnecessary scrutiny and critique, discriminatory discipline, and baseless negative evaluations;

g.  retaliating against those Plaintiffs and other employees of color who complain about and/or otherwise oppose discrimination by subjecting them to conduct that might have discouraged a reasonable worker from making or supporting a charge of discrimination; and

h.  refusing to provide equal terms and conditions of employment for Plaintiffs and other employees of color.

3.      The employment policies and practices of Bank of America have the effect and have been undertaken with the purpose of denying Plaintiffs and other employees of color management level positions and promotional opportunities, equal compensation, and equal terms and conditions of employment.

4.      In addition, Bank of America has engaged in a pattern of retaliation designed to deter Plaintiffs and other employees of color from objecting to and/or otherwise opposing the Defendants' discriminatory policies and practices.  Bank of America has retaliated against Plaintiffs and other employees of color by terminating them and denying them opportunities for promotion or transfer after such persons have exercised their civil rights by objecting to and/or otherwise opposing the Defendants' discriminatory policies and practices.

5.     Plaintiffs accordingly bring this action under the Civil Rights Act of 1866, as amended in 1991, 42 U.S.C. § 1981 ("Section 1981"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981(a) ("Title VII"), the New York State Human Rights Law (the "NYSHRL"), and the New York City Human Rights Law (the "NYCHRL").

6.     This class action seeks declaratory, injunctive and equitable relief, as well as monetary damages, to redress Bank of America's unlawful employment practices.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343, as this action involves federal questions regarding the deprivation of the rights of Plaintiff and the class members under federal civil rights laws.  The Court has supplemental jurisdiction over Plaintiffs' related individual claims arising under state and local law pursuant to 28 U.S.C. § 1367(a).

8.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c) because Bank of America resides in this district and a substantial part of the events or omissions giving rise to this action occurred in this district.

## PARTIES

9.     Plaintiff and class representative Marjorie Donaldson is an African-American former employee who worked in Bank of America's Global Commercial Banking Group ("GCBG") in its Manhattan and Brooklyn offices.  At all relevant times, she met the definition of "employee" under all applicable statutes.

10.     Plaintiff and class representative Paulette Proverbs is an African-American employee working in Bank of America's GCBG in its Manhattan and Brooklyn offices.  At all relevant times, she met the definition of an "employee" under all applicable statutes.

11.     Plaintiff and class representative Latoya Lawrence is an African-American employee working in Bank of America's GCBG in its Manhattan and Brooklyn offices. At all relevant times, she met the definition of "employee" under all applicable statutes.

12.     Plaintiff and class representative Neelum Malkani is an Asian-American former employee who worked in Bank of America's GCBG in its Manhattan and Brooklyn offices. At all relevant times, she met the definition of an "employee" under all applicable statutes.

13.     Plaintiff and class representative Bankim Bhargava is an Asian-American former employee who worked in Bank of America's GCBG in its Melville and Brooklyn offices. At all relevant times, he met the definition of an "employee" under all applicable statutes.

14.     Plaintiffs were or are employed by Bank of America as Client Managers ("CMs"), Client Development Managers ("CDMs"), Product Delivery Analysts ("PDAs"), and Sales Support Associates ("SSAs")

15.     Defendant BAC is a Delaware corporation headquartered in Charlotte, North Carolina, and is a worldwide financial services organization with business groups offering wealth management, investment banking, private banking, securities, and asset management services throughout the United States. BAC conducts its operations through its bank and non-bank subsidiaries operating in 30 states, including New York. BAC employs approximately 275,000 people.

16.     Defendant Bank of America, N.A. is a nationally chartered bank and one of two banking subsidiaries of BAC.

17.     At all relevant times, Bank of America has met the definition of an "employer" under all applicable statutes.

## PROCEDURAL REQUIREMENTS

18.     On or about November 7, 2008, Plaintiff Proverbs filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging violations of Title VII against her and similarly situated employees and former employees.  The charge arises out of the same facts alleged herein.

19.     On or about October 24, 2008, Plaintiff Donaldson filed a charge of discrimination with the EEOC, alleging violations of Title VII against her and similarly situated employees and former employees.  The charge arises out of the same facts alleged herein.

20.     On or about October 24, 2008, Plaintiff Lawrence filed a charge of discrimination with the EEOC, alleging violations of Title VII against her and similarly situated employees and former employees.  The charge arises out of the same facts alleged herein.

21.     On or about April 7, 2008, Plaintiff Malkani filed a charge of discrimination with the EEOC, alleging violations of Title VII against her and similarly situated employees and former employees.  On or about November 6, 2008, Plaintiff Malkani filed an amended charge of discrimination with the EEOC.  The charges arise out of the same facts alleged herein.

22.     On or about September 10, 2008, Plaintiff Bhargava filed a charge of discrimination with the EEOC, alleging violations of Title VII against him and similarly situated employees and former employees.  On or about November 6, 2008, Plaintiff Bhargava filed an amended charge of discrimination with the EEOC.  The charges arise out of the same facts alleged herein.

23.     On March 26, 2010, the EEOC issued, at Plaintiffs' requests, a right to sue.

24.     Prior to filing, a copy of this Complaint was served on the New York City Commission on Human Rights and the Offices of the Corporation Counsel of the City of New

York, thereby satisfying the notice requirements of § 8-502 of the New York City Administrative Code.

25.     Any and all other prerequisites to the filing of this suit have been met.

## CLASS ACTION ALLEGATIONS

**Class Definition**

26.     Plaintiffs seek to maintain claims on their own behalf and on behalf of a class of current and former Bank of America employees of color who have been employed by Bank of America in its GCBG as, or at levels equivalent to CM, CDM, PDA, and SSA between March 2006 and the present and have experienced race and/or color discrimination at any time during the applicable liability period (the "Class"). Upon information and belief, there are hundreds, if not thousands, of members of the proposed Class. The Class consists of African-American/Black, Hispanic, Asian and other non-White employees of Bank of America in New York. The Class Representatives are members of the Class.

27.     Further, Plaintiffs seek to maintain claims on behalf of a subclass of current and former Bank of America CMs, CDMs, PDAs and SSAs of color who working in the GCBG and who are entitled to protection under the NYSHRL and the NYCHRL (the "New York Subclass").

28.     As set forth in more detail below, Plaintiffs and the Class are routinely subjected to a pattern and practice of race and/or color discrimination affecting the terms and conditions of their employment at Bank of America.

29.     These practices reflect that discrimination is the standard operating procedure – the regular, rather than the unusual, practice at Bank of America.

7

30.     As a result of this Company-wide discrimination, there is a glass ceiling adversely affecting Plaintiffs and the Class at Bank of America.

31.     Bank of America's compensation, assignment and promotion policies, practices and/or procedures incorporate the following discriminatory practices:

a.   failing to compensate Plaintiffs and the Class the same as similarly situated White employees;

b.   failing to promote Plaintiffs and the Class at the same rate and on the same terms and conditions as similarly situated White employees;

c.   relying on racial stereotypes by engaging in the practice of "racial steering" in decisions as to promotions, territorial assignments, account assignments, business opportunities, and other terms and conditions of employment affecting Plaintiffs and the Class;

d.   relying on subjective judgments, procedures and criteria which permit and encourage the incorporation of racial stereotypes and bias by Bank of America's predominantly White managerial and supervisory staff in making compensation, assignment and promotion decisions affecting Plaintiffs and the Class;

e.   steering and/or channeling Plaintiffs and the Class to less prestigious and less financially rewarding locations;

f.   subjecting Plaintiffs and the Class to disparate treatment concerning the use and application of Company policies, procedures, evaluations, and investigations, including repeated, baseless warnings, unnecessary scrutiny and critique, discriminatory discipline, and baseless negative evaluations;

g. retaliating against those Plaintiffs and members of the Class who complain about and/or otherwise oppose discrimination by subjecting them to conduct that might have discouraged a reasonable worker from making or supporting a charge of discrimination; and

h. refusing to provide equal terms and conditions of employment for Plaintiffs and the Class.

32. Bank of America's written and unwritten policies concerning and including, but not limited to, hiring, promotion, compensation, territorial/work assignments, training, access to financial accounts/business, departing employee account assignments, distribution of business support and office resources, and application of company policies/procedures were not applied uniformly or fairly to Plaintiffs and the Class. On the contrary, these decisions were often based on management's subjective and racially biased decision-making adversely affecting Plaintiffs and the Class.

33. By entrusting managers, virtually all of whom are White, with undue discretion in these matters, Bank of America maintains a system whereby managers apply their own personal subjective decision-making preferences and biases in making allocation decisions that systematically disadvantage Plaintiffs and the Class and limit their compensation.

34. The aforementioned pattern of unequal territorial assignments, support, resources, compensation, and advancement opportunities is not the result of random or non-discriminatory factors. Rather, it is the result of an on-going and continuous pattern of intentional racial discrimination in assignments, support, resources, compensation, and promotions, and reliance on policies and practices that have an adverse impact on Plaintiffs and the Class that cannot be

justified by business necessity, and for which alternative policies and practices with less discriminatory impact could be utilized instead.

35.    Bank of America supervisors are vested with discretion in the discharge of their duties, and are afforded the latitude to apply their own personal subjective preferences and biases in making employment decisions.  Collectively, these decisions comprise a practice which is excessively subjective, has no legitimate business justification, and creates a disparate impact on Plaintiffs and the Class.

36.    There are alternative policies, practices and procedures available to Bank of America with respect to compensation, assignments and promotions that are objective, more valid, and more closely related to actual responsibilities and performance.  However, Bank of America has failed or refused to use such alternative procedures in favor of maintaining a corporate culture of systemic race and color discrimination against Plaintiffs and the Class.

37.    As a result, qualified Plaintiffs and Class members have been intentionally denied equal employment opportunities, compensation, benefits and employment terms and conditions that are provided to similarly situated White employees.

38.    Plaintiffs and the Class have been adversely affected by these excessively subjective policies and practices.

39.    Accordingly, the policies and practices identified herein are being challenged under systemic disparate treatment and/or disparate impact theories of discrimination.

40.    The above cited discriminatory practices and retaliation have resulted in patterns of discriminatory disparate treatment and/or disparate impact toward Plaintiffs and the Class at Bank of America.

**Efficiency of Class Prosecution of Common Claims**

41.     Certification of a Class of employees of color similarly situated to Plaintiffs is the most efficient and economical means of resolving the questions of law and fact that are common to Plaintiffs' claims and those of the proposed Class.

42.     Plaintiffs' individual claims require resolution of the common question of whether Bank of America's GCBG has engaged in a systemic pattern and practice of discrimination against employees of color.

43.     Plaintiffs have standing to seek such relief because of the adverse effect that such discrimination has had on them individually and on employees of color generally.

44.     Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.

45.     Certification of the proposed class is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for Plaintiff, the proposed Class, and Defendants.

**Numerosity and Impracticability of Joinder**

46.     The individuals in the Class are so numerous that joinder of all members is impracticable.  Although the number of Class members is incapable of precise determination at this time, it is significant, exceeds hundreds, upon information and belief, and satisfies the numerosity requirement of Fed. R. Civ. P. 23.

**Common Questions of Law and Fact**

47.     There are questions of law and fact common to the Class that predominate over any questions affecting only individuals.  Among these questions are:

a.   whether Bank of America maintains discriminatory policies and/or has engaged in an unlawful pattern and practice of denying the Class compensation commensurate with similarly situated White employees;

b.   whether Bank of America maintains discriminatory policies and/or has engaged in an unlawful pattern and practice of denying or delaying promotions of Class members that that are available to similarly situated White employees;

c.   whether Bank of America has deterred, discouraged or precluded the Class from seeking advancement, obtaining the training, support, resources, and/or favorable assignments provided to similarly situated White employees;

d.   whether Bank of America has steered or channeled Class members to territories, regions and/or departments within Bank of America with less advancement potential than those in which similarly situated White employees work;

e.   Whether Bank of America has subjected the Class to disparate treatment concerning the use and application of Company policies, procedures, evaluations, and investigations, including repeated, baseless warnings, unnecessary scrutiny and critique, discriminatory discipline, and baseless negative evaluations, than the Class;

f.   whether Bank of America has unlawfully retaliated against the Class for complaining about and/or opposing race discrimination; and

g.   whether Bank of America has relied on unweighted, and overly subjective and discriminatory criteria with respect to its treatment of and the establishment of the terms and conditions of employment for Class members as compared to similarly situated White employees.

48.     The discriminatory employment policies, practices and/or procedures to which Plaintiffs and the members of the Class are subject are established at Bank of America's corporate level and apply universally to all Class members throughout the Country and to U.S. citizens working abroad.  These employment policies, practices and/or procedures are not unique or limited to any department; rather, they apply to all departments.

49.     Throughout the liability period, a disproportionately large percentage of the managers, supervisors, division heads, and executives at Bank of America have been White.

50.     Discrimination in selection, promotion and advancement occurs as a pattern and practice throughout all levels and divisions of Bank of America.  Selection, promotion and advancement opportunities are driven by personal familiarity, subjective decision-making, pre-selection and interaction between White managers, supervisors, and subordinates rather than by merit or equality of opportunity.

51.     Additionally, Bank of America regularly steers and/or channels the Class members to less desirable and less financially rewarding locations.

52.     As a result, White employees have advanced and continue to advance more rapidly to better and higher paying jobs than employees of color.

**Typicality of Claims and Relief Sought**

53.     Plaintiffs are members of the Class they seek to represent.  Plaintiffs' claims are typical of the claims of the proposed Class.  Plaintiffs assert claims in each of the categories of claims they assert on behalf of the proposed Class.  Discrimination in compensation, promotions, assignments, discipline, as well as retaliation, affect Plaintiffs and the proposed Class members in similar ways.  The relief Plaintiffs seek for the discrimination complained of herein is also typical of the relief which is sought on behalf of the proposed Class.

54.     Plaintiffs and other Class members have complained to Bank of America's management and Human Resources about and/or opposed race and color discrimination within Bank of America.  Bank of America investigations into these complaints have been inadequate or superficial and have fostered, or, at a minimum, have tolerated retaliation against such employees.  Plaintiffs and the Class members have been affected in the same way by Bank of America's failure to implement adequate procedures to detect, monitor and correct this pattern and practice of discrimination, as well as prevent retaliation against those who complain about and/or oppose it, such that Plaintiffs and the Class are chilled from engaging in protected activity needed to guarantee enforcement of discrimination laws for all employees of Bank of America.

55.     Plaintiffs and members of the Class have experienced retaliation from Bank of America managers and supervisors after complaining about race discrimination, contacting Human Resources, or filing EEOC charges of discrimination.

56.     Bank of America has failed to create adequate incentive for its managers to comply with equal employment opportunity laws regarding each of the employment policies, practices and/or procedures referenced in this Complaint and has failed to adequately discipline its managers and other employees when they violate the anti-discrimination laws and/or engage in retaliation.  As described above, these failures have affected Plaintiffs and the Class members in similar ways.

57.     The relief necessary to remedy the claims of Plaintiffs is exactly the same as that necessary to remedy the claims of the proposed Class in this case.  Plaintiffs seek the following relief for their individual claims and for those of the proposed Class:

a.  a declaratory judgment that Bank of America has engaged in systemic race discrimination against Plaintiffs and the Class by limiting their ability to be

promoted to better and higher paying positions, limiting their training and transfer opportunities, steering and/or channeling them to less desirable and less financially rewarding locations, exposing them to differential treatment, subjecting them to racial hostility at work, and retaliating against them for complaining about and/or opposing race and color discrimination;

b. a permanent injunction against such continuing discriminatory conduct;

c. injunctive relief which effects a restructuring of Bank of America's promotion, transfer, training, performance, evaluation, compensation, work environment and discipline policies, practices and/or procedures so that the Class will be able to compete fairly in the future for promotions, transfers, and assignments to better and higher paying classifications with the same favorable terms and conditions of employment traditionally enjoyed by White employees;

d. equitable relief which effects a restructuring of Bank of America's workforce so that members of the Class are promoted into higher and better paying classifications that they would have achieved in the absence of Bank of America's past race and/or color discrimination;

e. back pay and front pay to remedy the denial of equal compensation and benefits to the Class;

f. reinstatement of Plaintiffs or any Class member who was unlawfully terminated;

g. compensatory damages;

h. punitive and nominal damages; and

i. attorneys' fees, costs and expenses.

**Adequacy of Representation**

58.     Plaintiffs' interests are co-extensive with those of the Class in this case.  Plaintiffs

seek to remedy Bank of America's discriminatory employment policies, practices and/or

procedures so that the Class will no longer be prevented from earning as much as their White

counterparts and will not receive differential treatment in their working conditions.

59.     Plaintiffs are willing and able to represent the proposed Class fairly and

vigorously as they pursue their similar individual claims in this action.

60.     Plaintiffs have retained counsel who are qualified, experienced and able to

conduct this litigation and to meet the time and fiscal demands to litigate an employment

discrimination class action of this size and complexity.

61.     The combined interests, experience and resources of Plaintiffs and their counsel to

litigate competently the individual and class claims at issue in this case satisfy the adequacy of

representation requirement of Fed. R. Civ. P. 23(a)(4).

**Requirements of Rule 23(b)(2)**

62.     Bank of America has acted on grounds, described herein, generally applicable to

Plaintiffs and the proposed Class by adopting and following systemic policies, practices and/or

procedures that are discriminatory on the basis of race and/or color.  This discrimination is Bank

of America's standard operating procedure rather than a sporadic occurrence.

63.     Bank of America's systemic discrimination and refusal to act on grounds that are

not discriminatory have made appropriate the requested final injunctive and declaratory relief

with respect to the Class as a whole.

64.     Injunctive and declaratory relief are the predominant relief sought in this case

because they are the culmination of the proof of Bank of America's individual and class-wide

liability and the essential predicate for Plaintiffs' and the Class members' entitlement to monetary and non-monetary remedies to be determined at a later stage of the proceedings.

65.     Declaratory and injunctive relief flow directly and automatically from proof of the common questions of law and fact regarding the existence of systemic discrimination against employees of color at Bank of America.

66.     Declaratory and injunctive relief are the factual and legal predicates for Plaintiffs and the Class members' entitlement to monetary and non-monetary remedies for individual losses caused by, and for exemplary purposes necessitated by such systemic discrimination.

**Requirements of Rule 23(b)(3)**

67.     The common issues of fact and law affecting Plaintiffs' claims and those of the proposed Class, including, but not limited to, the common issues identified in the paragraphs above, predominate over any issues affecting only individual claims.

68.     A class action is superior to other available means for the fair and efficient adjudication of Plaintiffs' claims and the claims of the proposed Class.

69.     The cost of proving Bank of America's pattern and practice of discrimination makes it impracticable for Plaintiff and members of the proposed Class to pursue their claims individually.

## ALLEGATIONS OF THE INDIVIDUAL PLAINTIFFS

**Marjorie Donaldson**

70.     Marjorie Donaldson is an African-American woman with an established record of excellent performance.  She joined Bank of America in 2003 as an Account Manager in the Card Services Division in the Newark, New Jersey, office.

71.     In 2006, Ms. Donaldson successfully posted to the GCBG in the Manhattan office as an SSA.  As an SSA, Ms. Donaldson provided support to CMs.

72.     Ms. Donaldson's superior performance was been recognized in written compliments from clients and from her supervisors.  In 2006, for example, Ms. Donaldson received "Exceeds Expectations" on her performance review, the highest possible ranking.

73.     Despite her stellar performance, Ms. Donaldson experienced a glass ceiling in her employment that prevented further advancement.  She was ultimately terminated in February 2010.

74.     Ms. Donaldson has also been subjected to repeated, baseless warnings, unnecessary scrutiny and critique, and discriminatory discipline.

75.     In April 2007, Ms. Donaldson was forced, like many other employees of color, to transfer from the Manhattan office to the Brooklyn office.  When she arrived in the Brooklyn office, Ms. Donaldson found that Bank of America had concentrated a number of employees of color in this one location, which served an area with a significant minority population.

76.     Ms. Donaldson also realized that in the Brooklyn location, SSAs were required to work harder.  For example, in Brooklyn, Ms. Donaldson was assigned to work with four CMs, while when she was assigned to the Manhattan office, she worked with only two CMs.  On many

18

occasions, Ms. Donaldson would have to support an entire team of twelve CMs when her teammates where not in the office.

77.     This setup created significant additional work for Ms. Donaldson.  It was also consistent with Bank of America's discriminatory pattern and practice of failing to provide the same level of support to its employees of color (who are deliberately grouped in certain, less desirable areas) as it provides to its White employees.

78.     In addition to the discriminatory transfer suffered by Ms. Donaldson, she was repeatedly denied merit salary increases, despite requesting and being qualified for such increases.

79.     As a result of Bank of America's unlawful conduct, Ms. Donaldson has been paid less than similarly situated White employees by way of base salary and/or bonus.

80.     In fact, Ms. Donaldson was discriminated against when she, as a Black woman, had the courage to request a salary increase.  In November 2007, after Ms. Donaldson requested a salary increase from her supervisor, she was given a written warning.  The warning prevented Ms. Donaldson from pursuing a long-desired transfer to a position with the Premier Banking division.

81.     Thereafter, Ms. Donaldson received a series of baseless written warnings, which were obviously designed to create a false record of performance "issues" to serve as a pretext for her ultimate termination.  The baseless written warnings included a warning for visiting a Bank of America supervisor in the hospital, and a warning because paperwork was not completed while Ms. Donaldson was on vacation, despite the fact that she had described the work that needed to be completed in an email to her supervisor and co-workers.

82. In addition to the written warnings, Ms. Donaldson, unlike similarly situated White employees, was treated like a common criminal when she was ordered to produce an original doctor's note when she called out sick, rather than a copy.

83. Ms. Donaldson repeatedly reported the illegal and discriminatory conduct to which she was subjected to executives at Bank of America, having done so in December 2007 and again in March 2008 when her treatment by Bank of America still had not changed.

84. Bank of America did not take sufficient steps to address Ms. Donaldson's complaints or to protect her from further discrimination. In fact, after Ms. Donaldson complained, she received no bonus and the final written warning noted above.

85. In further acts of retaliation, she was subjected to undue scrutiny and unfounded criticism and otherwise treated differently than other SSAs. For example, Ms. Donaldson was criticized unreasonably for not responding to a fellow SSA's email regarding an overdraft report, even though Ms. Donaldson never received the email.

86. Ms. Donaldson was also subject to undue scrutiny whenever she worked remotely from a location other than the Brooklyn office or attended a client call with her CMs. While White SSAs were assumed to be actually working when at remote locations, Ms. Donaldson was not. Instead, her supervisor assumed that she was neglecting her duties when she reported that she was working at a remote location.

87. In another sign of retaliatory and discriminatory treatment suffered by Ms. Donaldson, she was told that she could not expect a promotion for at least two to three years.

88. In fact, Ms. Donaldson was never given the opportunity to apply for any promotion since she was terminated for unlawful reasons on February 4, 2010.

89.     The pretext given for Ms. Donaldson's termination was that she submitted false timesheets that indicated that she worked 40 hours each week.  In fact, Ms. Donaldson reported 40 hours per week but worked more than that.  She was warned, illegally, by her supervisor to never report more than 40 hours per week on her timesheet, and never to request overtime pay. Nonetheless, Ms. Donaldson's supervisor pushed her to work in excess of 40 hours each week. It was thus discriminatory and unlawful for Bank of America to terminate Ms. Donaldson for following her supervisor's instructions.  Other, White team members of Ms. Donaldson and/or team members who had not lodged complaints of discrimination were not terminated.

**Paulette Proverbs**

90.     Ms. Proverbs is an African-American woman with an incredible twenty two year history at Bank of America.  Having started as a secretary in 1987, Ms. Proverbs is now a CM in GCBG on the Brooklyn/Manhattan team.

91.     Ms. Proverbs earned a series of promotions and increases in compensation in her long career at Bank of America due to her hard-work, dedication and stellar performance, which continue to this day.

92.     In January 2006 after her first full year as a CM, Ms. Proverbs was awarded her team's Rookie of the Year award.

93.     In January 2007, Ms. Proverbs was given the team's Spirit Award for her outstanding work and also received the highest score in client satisfaction for the Brooklyn team, despite missing time in the office due to injuries sustained in a car accident.

94.     Ms. Proverbs consistently meets her business quotas, making her a top performer in revenue production within her team.

95.    Despite Ms. Proverbs' many successes, Bank of America has subjected her to discriminatory conduct, including repeated baseless warnings, unnecessary scrutiny and discriminatory discipline.

96.    Ms. Proverbs has also been subjected to repeated, baseless warnings, unnecessary scrutiny and critique, and discriminatory discipline.

97.    Ms. Proverbs was also subject to an environment in which her White supervisor stated in front of Bank of America employees that she did not like migrants, scolded an employee not to use Spanish in the office, stating "This is America.  In America, we speak English," and further stated that an employee of color should be assigned to the Bronx because a "white Irish guy" was more suited for Manhattan.

98.    Ms. Proverbs has been subject to repeated discriminatory and baseless warnings unnecessary scrutiny and critique, and discriminatory discipline.  For example, in January 2007, Ms. Proverbs was criticized for only achieving 18 of her 20 "call" goal for the month, despite the fact that she was out of the office for two weeks in the month due to legitimate medical issues.

99.    In July 2007, Ms. Proverbs received her mid-year evaluation.  Despite excellent success in producing revenue, including placing in the top third of her team in all categories and meeting two of her four annual goals after only six months, she was criticized for her "what skills" and placed on written warning.  The "what" skills are meant to measure an employee's actual revenue production and other quantifiable statistics.

100.    Despite being untrue, Ms. Proverbs redoubled her efforts, and ended up exceeding most of her year-end goals.

101. When she was reviewed again at the end of the year, Ms. Proverbs was issued yet another the written warning, this time for her "how skills," which included vague and subjective performance categories such as "leadership."

102. As a result of the end of the year review, Ms. Proverbs was denied her yearly bonus despite having been assured that it was her "what" skills, *i.e.*, her actual revenue production, which was among the top in her team, that would govern any bonus determination.

103. In August 2007, Ms. Proverbs continued to be singled out on the basis of her race and color when she was newly required to have weekly meetings with her supervisor for "coaching." Ms. Proverbs was required to attend these coaching sessions while White CMs who fell below her in production were not. Moreover, she was not actually provided with any coaching during these sessions; instead, she was just verbally abused.

104. Further, Ms. Proverb's supervisor went so far as to ask two of Ms. Proverbs' clients if they wanted to be moved to another CM who was White – in contravention to Bank of America's policy not to move a client unless the client specifically requests such a move.

105. During these events, Ms. Proverbs was in frequent communication with Human Resources and other executives at the Company in order to make them aware of the unfair treatment she was receiving.

106. Ms. Proverbs first contacted Human Resources in March 2007, then again in August 2007. Rather than remedy the discrimination, Human Resources told Ms. Proverbs that she should take the "coaching" that was being provided.

107. In 2008, Ms. Proverbs continued to complain to Human Resources, making it clear she felt the poor treatment was due to her race and color. Her complaints were to no avail.

108.   Ms. Proverbs' efforts to obtain help concluded with a written complaint of racial discrimination to Human Resources in April 2008.

109.   Within a week of this written complaint, however, Ms. Proverbs was retaliated against for her protected conduct by being issued a "final" written warning that contained a clear threat of termination.  Since making the written complaint, Ms. Proverbs has also been repeatedly subject to unfounded criticism, denied awards and recognition for her work and otherwise denied compensation and benefits commensurate with her work performance.

110.   As a result of Bank of America's unlawful conduct, Ms. Proverbs has been paid less than similarly situated White employees by way of base salary and/or bonus.

111.   Further, the discriminatory and retaliatory treatment to which Ms. Proverbs has been subject continues to hold her back from merit based salary increases and promotions to which she would otherwise be entitled to.

112.   This obviously retaliatory treatment will be one of the many allegations of the suit that are similar to the experience of the other plaintiffs and are indicative of a pattern and practice of race and/or color discrimination across Bank of America.

**Latoya Lawrence**

113.   Ms. Lawrence, an African-American woman, has also been subjected to a similar pattern and practice of racial discrimination and retaliation at Bank of America.

114.   Ms. Lawrence was hired as a permanent employee of Bank of America in October 2005 and initially worked in Connecticut.  In May 2007, Ms. Lawrence was reassigned to the Brooklyn office, consistent with Bank of America's steering policy towards minorities.

115.   Ms. Lawrence has been subjected to repeated, baseless warnings, unnecessary scrutiny and critique, and discriminatory discipline.

116.    First, although Ms. Lawrence was told by her immediate supervisor that her performance merited a promotion, and that her name had been submitted for a promotion, another, higher-level supervisor discriminatorily and arbitrarily refused to grant Ms. Lawrence the promotion on the vague and thoroughly subjective grounds that Ms. Lawrence was allegedly not a "team player."

117.    Ms. Lawrence was also subjected to discriminatory treatment in that she was criticized harshly for working remotely, despite occasional medical needs, and visiting her supervisor in the hospital.

118.    Further, as a result of Bank of America's unlawful conduct, Ms. Lawrence has been paid less than similarly situated White employees by way of base salary and/or bonus.

119.    The discriminatory treatment of Ms. Lawrence also included being singled out for the requirement that she notify a series of individuals who were not her supervisors as to when she needed to take sick leave and vacation time.  Those supervisors would, in turn, frequently berate her for taking time off.  Other, similarly situated White employees were not subject to the same treatment when requesting sick leave and vacation time.

120.    Ms. Lawrence sought the assistance of Human Resources to deal with the disparate treatment.  In addition to a number of verbal reports, Ms. Lawrence also specifically identified in writing that she was being treated differently due to her race and/or color.  Human Resources did nothing to relieve Ms. Lawrence's situation.

121.    Barely more than a week after making her written complaint to Human Resources, Ms. Lawrence was retaliated against by being issued a written warning, the first discipline ever in her career at Bank of America.

122.   In further retaliation for Ms. Lawrence's complaints, Ms. Lawrence was transferred out of the Brooklyn office to the Manhattan office, and was assigned additional sales people to support.

123.   Additionally, since raising her concerns of discrimination and retaliation, Ms. Lawrence has applied for numerous other positions with Bank of America, but has not been offered any position. After a number of her applications, Ms. Lawrence has been told that the posting has been cancelled; however, those postings have later reappeared. Such conduct constitutes blatant retaliation against Ms. Lawrence and unreasonably perpetuates the hostile work environment that she has been forced to endure while working for Bank of America.

**Neelum Malkani**

124.   Ms. Malkani, who is Asian-American, began working for Bank of America in October 2006 as a CDM in the Manhattan office. In contrast to a regular CM, Ms. Malkani was given a smaller book of clients when she started and greater responsibility in developing new business.

125.   During her employment with Bank of America, Ms. Malkani was a successful employee with complete dedication to the Company, as evidenced by the high level of satisfaction expressed by her clients, her ongoing efforts to develop new business relationships, and the respect shown by her colleagues.

126.   Despite her excellent performance, Ms. Malkani was subjected to discrimination on account of her race and/or color, and when she complained, Bank of America retaliated against her.

127.   Ms. Malkani has also been subjected to repeated, baseless warnings, unnecessary scrutiny and critique, and discriminatory discipline.

128.    As an early example of the discriminatory treatment, although Ms. Malkani successfully completed Bank of America's three month training program, she was not paid Bank of America's standard $3,000 bonus for doing so that other White employees regularly received.

129.    In another early example of discriminatory treatment, in March 2007, Ms. Malkani was transferred from Manhattan to Brooklyn, which was consistent with the company-wide practice of transferring employees of color to areas with high minority populations.  Bank of America compelled Ms. Malkani to transfer to Brooklyn, despite the fact that in her over 10 years of banking experience she had worked primarily in Manhattan with Manhattan based clients.  Further, Bank of America made it clear to Ms. Malkani that her transfer was not optional.

130.    Moreover, Bank of America failed to provide the book of clients Ms. Malkani had been promised.  Indeed, at first, she was given no business at all, and after much effort, only received approximately 15-20 accounts for which significant additional business could not be expected.

131.    These accounts did not fit the profile of the group to which Ms. Malkani was assigned.  These were accounts rejected by other CMs due to poor revenue potential and were smaller accounts.  Ms. Malkani, in contrast, is one of the few credit-trained CMs or CDMs experienced in middle market accounts of $10 million to $500 million.  Under Bank of America's compensation structure, the types of client assignments Ms. Malkani received were highly detrimental to her earnings potential.  In addition, most of these clients were on the verge of leaving Bank of America as their accounts had been neglected for years or otherwise improperly handled by other CMs.  Nonetheless, Ms. Malkani was told that if any clients in her existing portfolio left, it would significantly effect her compensation.  As a result, Ms. Malkani

spent extensive amounts of time repairing those broken relationships with existing clients, as well as developing new business. Similarly situated White employees were not given such poor accounts without making expectation accommodations. Remarkably, she managed to save all of those clients from leaving Bank of America.

132.    Despite the poor accounts given to Ms. Malkani, she was criticized about the amount of business she developed. The first such criticism occurred when she had been with Bank of America for only six months, three of which were devoted to training and travel. Further, her transfer from Manhattan to Brooklyn meant that she was working in a new area and market to which she had no prior connection, and she was not given a ramp-up period to adjust to the new territory, as is customary in the banking industry.

133.    The criticism was also unwarranted and unfair because it is commonly known that CMs and CDMs typically do not meet annual goals in even month to month increments because production increases towards the end of the year as deals put into development earlier come to fruition. Indeed, at the time she was criticized, Ms. Malkani had a number of deals in development that would place her well on the way to meeting her targets.

134.    Ms. Malkani was also singled out for criticism, unlike White CMs and/or CDMs, because she took sick time to attend physical therapy and other medical appointments to treat, among other things, stress caused by the constant, unwarranted, discriminatory treatment to which she was subject.

135.    Further, as a result of Bank of America's unlawful conduct, Ms. Malkani has been paid less than similarly situated White employees by way of base salary and/or bonus.

136.    In mid-2007, despite having deals in progress worth over $5 million, Ms. Malkani was issued a verbal performance warning. In a meeting with her supervisor, Ms. Malkani was

asked to consider if banking was what she really wanted to do and told that she should consider leaving Bank of America or transferring to another department.

137.    Subsequently, Ms. Malkani was subject to even more intense discriminatory criticism.  Her supervisor told her that she could either achieve 60 percent of her annual goals in 30 days, or start looking for another job.  While this ultimatum was clearly intended to push Ms. Malkani out of Bank of America, Ms. Malkani indicated that she would meet 60 percent of her annual goals.

138.    When Ms. Malkani indicated she would try to save her job, she was placed on written warning and given less than 30 days to improve her performance.  The written warning prevented Ms. Malkani from interviewing for a new position internally.

139.    Incredulous, Ms. Malkani called Bank of America's employee complaint center for human resources issues and reported that she was being harassed and that because the treatment was so arbitrary and baseless, Ms. Malkani believed it was due to her South Asian background.  This was one of many times that she contacted Human Resources to complain of discriminatory conduct.

140.    Ms. Malkani found it impossible to work in such a discriminatory environment and under constant threat of termination.  She thus decided the only way she could save her career prospects, while safeguarding her health, would be to resign, rather than have her resume marred by the imminent firing that her supervisor had promised.  Ms. Malkani was constructively discharged in June 2007.

141.    The retaliation against Ms. Malkani continued even after she left Bank of America, with her former supervisor improperly deducting sick days from her final paycheck, and placing Ms. Malkani on Bank of America's "do not rehire list."  Upon information and

belief, the "do not rehire list" is used almost exclusively for former employees who committed some sort of crime or ethical violation, neither of which applied to Ms. Malkani who always acted with the utmost professionalism and the highest ethical standards. When Ms. Malkani questioned why she had been placed on the "do not rehire list," her former supervisor – indicating yet again the excessive degree of authority Bank of America supervisors are given – said only that she had placed Ms. Malkani on the list because she felt she deserved to be on it and because it was her "decision to do so." As a result, Ms. Malkani will never be able to work for Bank of America in any capacity in any location worldwide. As a banking professional, and given the size of Bank of America, this seriously harms Ms. Malkani's future employment prospects.

**Bankim Bhargava**

142.   In February 2007, Mr. Bhargava joined Bank of America from Australia, a move which obviously involved tremendous effort, expense and disruption for his family. Mr. Bhargava had been recruited by Bank of America for his valuable experience in franchise financing and was hired to be a franchising CM for the Melville, Long Island office.

143.   As an initial matter, Mr. Bhargava received less compensation that similarly situated White employees by way of wages and/or bonuses.

144.   Mr. Bhargava has also been subjected to repeated, baseless warnings, unnecessary scrutiny and critique, and discriminatory discipline.

145.   The Bank represented to Mr. Bhargava that this position involved more portfolio management than sales, and that Mr. Bhargava would be given an existing book of business with which to work.

146.    In the spring of 2007, consistent with Bank of America's pattern and practice of transferring employees of color, Mr. Bhargava was transferred from Melville to the Brooklyn location.

147.    Further, Mr. Bhargava was also denied the standard $3,000 bonus upon completion of Bank of America's three month training program that other White employees regularly received.

148.    With this transfer, Mr. Bhargava was also denied the portfolio management role and the book of clients he was originally promised.  After repeated requests for the clients he was promised, Mr. Bhargava was finally given a few – the same poor quality prospects that had been originally given to Ms. Malkani.

149.    Thus, with the transfer to Brooklyn, Mr. Bhargava was placed in the position of having to close sales in a completely unfamiliar market, in a job entirely different from the one he had been promised and hired for and using a starting book of business with some of the worst client prospects available.

150.    Mr. Bhargava nonetheless began to bring in revenue and develop a number of prospects.  By November 2007, in barely six months time, Mr. Bhargava had closed $2.7 million in deals and was expecting to close another $2 million by year end.

151.    Despite these successes, Mr. Bhargava was issued a written performance warning for failing to make enough progress in meeting his revenue goals.  The warning was arbitrary and baseless since Mr. Bhargava had achieved significant sales considering his first three months of work were in training and that he had abruptly switched markets and the type of banking in which he worked.

152.    In order to "support" the baseless reprimand, Mr. Bhargava's supervisor told him that his revenue goal was raised, at her discretion, by $2 million.

153.    Bank of America, by giving such broad discretion without supervision or standardized criteria to managers, created an environment where the racial animus of managers could be freely expressed.

154.    Rather than continue to be subjected to this discriminatory treatment, Mr. Bhargava informed his supervisor that he would resign, rather than accept the discriminatory and baseless warning he was issued.

155.    Mr. Bhargava was then retaliated against by being threatened that he could not leave the building without telling his supervisor which bank he was going to work for, and being told he would be placed on the "do not rehire list," even though he had done nothing wrong.

156.    Further, although Mr. Bhargava, as a professional courtesy, gave Bank of America two weeks notice, he was told to leave immediately following his resignation, as if he had committed some sort of malfeasance, which he had not.  White employees in positions similar to Mr. Bhargava who resigned were not treated in the same poor and discriminatory manner.

157.    Thereafter, in a clear breach of federal and state labor laws, Mr. Bhargava's supervisor refused to release his final paycheck.  Mr. Bhargava repeatedly called Bank of America's Advice and Counsel line to complain about this illegal act.  Incredibly, representatives on the Advice and Counsel line confirmed that Mr. Bhargava was entitled to the pay but explained that his supervisor had taken steps to prevent its issuance.  This illegal withholding of Mr. Bhargava's earned wages continued until he was finally paid in March 2007, four months after he had resigned.

158.    In further obvious retaliation, Bank of America sent Mr. Bhargava letters threatening to sue him for purportedly taking Company materials.  This accusation was utterly baseless as Mr. Bhargava's supervisor had examined everything Mr. Bhargava took with him when he left Bank of America.  Nonetheless, Mr. Bhargava had to retain counsel to fight Bank of America's baseless claims, and, Bank of America, recognizing that its actions were without any basis in fact and that Mr. Bhargava would not be intimidated, dropped the matter.

159.    Similarly situated White employees were not treated as Mr. Bhargava had been when he left Bank of America.

160.    Clearly, the Company-wide policy of investing discretion with managers leaves them completely free not only to express their racial/color biases, but to retaliate against those who complain.

### AS AND FOR A FIRST CAUSE OF ACTION
**(Class and Individual Claims of Race and/or
Color Discrimination in Violation of 42 U.S.C. § 1981)**

161.    Plaintiffs hereby repeat and reallege each and every allegation stated in the paragraphs above as if fully set forth herein.

162.    Defendants have discriminated against Plaintiffs and the Class by denying them the same rights as enjoyed by White employees with regard to the making, performance, modification and termination of their employment relationship with Bank of America, and with regard to the enjoyment of all benefits, privileges, terms and conditions of that relationship in violation of the Civil Rights Act of 1866 as amended, 42 U.S.C. § 1981.

163.    Defendants' discriminatory conduct has resulted in patterns of discriminatory disparate treatment and/or disparate impact toward employees of color of Bank of America.

33

164.    Defendants' conduct has been intentional, deliberate, willful and conducted in callous disregard of the rights of Plaintiffs and the Class under the law, entitling Plaintiffs and the Class to an award of punitive damages.

165.    As a direct and proximate result of Defendants' discriminatory conduct in violation of the Civil Rights Act of 1866 as amended, 42 U.S.C. § 1981, Plaintiffs and the Class have suffered and continue to suffer monetary and/or economic harm, including but not limited to, loss of past and future income, compensation and benefits for which they are entitled to an award of damages.

166.    As a direct and proximate result of Defendants' discriminatory conduct in violation of the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981, Plaintiffs and the Class have suffered and continue to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which they are entitled to an award of damages.

167.    As a direct and proximate result of Defendants' discriminatory conduct in violation of the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981, Plaintiffs and the Class are entitled to an award of punitive damages.

## AS AND FOR A SECOND CAUSE OF ACTION
**(Class and Individual Claims of Race and/or Color Discrimination in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*)**

168.    Plaintiffs hereby repeat and reallege each and every allegation stated in the paragraphs above as if fully set forth herein.

169.    Plaintiffs have received Right to Sue letters from the EEOC.

170.    Defendants have discriminated against Plaintiffs and the Class on account of race and/or color in violation of Title VII, 42 U.S.C. §§ 2000e, *et seq.*, with regard to the making, performance, modification and termination of their employment relationship with Bank of America.

171.    Defendants' discriminatory conduct has resulted in patterns of discriminatory disparate treatment and/or disparate impact towards employees of color of Bank of America.

172.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Title VII, Plaintiffs and the Class have suffered, and continue to suffer, monetary and/or economic harm, including but not limited to, loss of past and future income, compensation, and benefits for which they are entitled to an award of damages.

173.    As a direct and proximate result of Defendants' unlawful discriminatory conduct and harassment in violation of Title VII, Plaintiffs and the Class have suffered, and continue to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which they are entitled to an award of damages.

174.    Defendants' unlawful discriminatory actions and harassment constitute malicious, willful and wanton violations of Title VII for which Plaintiffs and the Class are entitled to an award of punitive damages.

## AS AND FOR A THIRD CAUSE OF ACTION
### (New York Subclass and Individual Claims of Race and/or Color Discrimination in Violation of the New York State Human Rights Law)

175.    Plaintiffs hereby repeat and reallege each and every allegation stated in the paragraphs above as if fully set forth herein.

176.    Defendants have discriminated against Plaintiffs and the New York Subclass on the basis of their race and/or color in violation of the NYSHRL by subjecting them to unequal terms and conditions of employment.

177.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiffs and the New York Subclass have suffered and continue to suffer monetary and/or economic harm, including but not limited to loss of past and future income, compensation and benefits for which they are entitled to an award of damages.

178.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiffs and the New York Subclass have suffered and continue to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which they are entitled to an award of damages.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (New York Subclass and Individual Claims of Race and/or Color Discrimination in Violation of the New York City Human Rights Law)

179.    Plaintiffs hereby repeat and reallege each and every allegation stated in the paragraphs above as if fully set forth herein.

180.    Defendants have discriminated against Plaintiffs and the New York Subclass on the basis of their race in violation of the NYCHRL by subjecting them to unequal terms and conditions of employment.

36

181.   As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiffs and the New York Subclass have suffered and continue to suffer monetary and/or economic harm, including but not limited to loss of past and future income, compensation and benefits for which they are entitled to an award of damages.

182.   As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the New York City Human Rights Law, Plaintiffs and the New York Subclass have suffered and continue to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which they are entitled to an award of damages.

183.   Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of the New York City Human Rights Law for which Plaintiffs and the New York Subclass are entitled to an award of punitive damages.

## AS AND FOR A FIFTH CAUSE OF ACTION
**(Class and Individual Claims of Retaliation in Violation of Violation of 42 U.S.C. § 1981)**

184.   Plaintiffs hereby repeat and reallege each and every allegation stated in the paragraphs above as if fully set forth herein.

185.   Defendants have discriminated against Plaintiffs and the Class by retaliating against Plaintiffs and other employees who assert their civil rights, in violation of in violation of the Civil Rights Act of 1866 as amended, 42 U.S.C. § 1981.

186.   Defendants' conduct has been intentional, deliberate, willful and conducted in callous disregard of the rights of Plaintiffs and the Class under the law, entitling Plaintiffs and the Class to an award of damages.

187.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the Civil Rights Act of 1866 as amended, 42 U.S.C. § 1981, Plaintiffs and the Class have suffered and continue to suffer monetary and/or economic harm, including but not limited to loss of past and future income, compensation and benefits for which they are entitled to an award of damages.

188.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the Civil Rights Act of 1866 as amended, 42 U.S.C. § 1981, Plaintiffs and the Class have suffered and continue to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which they are entitled to an award of damages.

189.    As a direct and proximate result of Defendants' discriminatory conduct in violation of the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981, Plaintiffs and the Class are entitled to an award of punitive damages.

### AS AND FOR A SIXTH CAUSE OF ACTION
**(Class and Individual Claims of Retaliation in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*)**

190.    Plaintiffs hereby repeat and reallege each and every allegation stated in the paragraphs above as if fully set forth herein.

191.    Defendants retaliated against Plaintiffs and the Class in violation of Title VII for their opposition to Defendants' discriminatory practices towards them and/or their complaints about Defendants' discriminatory practices.

192.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Title VII, Plaintiffs and the Class have suffered and continue to suffer monetary

and/or economic harm, including but not limited to, loss of past and future income, compensation, and benefits for which they are entitled to an award of damages.

193.   As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Title VII, Plaintiffs and the Class have suffered, and continue to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which they are entitled to an award of damages.

194.   Defendants' unlawful retaliatory actions constitute malicious, willful and wanton violations of Title VII for which Plaintiffs and the Class are entitled to an award of punitive damages.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### (New York Subclass and Individual Claims of Retaliation in Violation of the New York State Human Rights Law)

195.   Plaintiffs hereby repeat and reallege each and every allegation stated in the paragraphs above as if fully set forth herein.

196.   Defendants have retaliated against Plaintiffs and the New York Subclass in violation of the NYSHRL for their opposition to discriminatory practices directed toward themselves and other employees of color and/or their participation in lodging complaints about such discriminatory practices toward themselves and other employees of color.

197.   As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiffs and the New York Subclass have suffered and continue to suffer monetary and/or economic harm, including but not limited to loss of past and future income, compensation and benefits for which they are entitled to an award of damages.

198.   As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiffs and the New York Subclass have suffered and continue to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which they are entitled to an award of damages.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### (New York Subclass and Individual Claims of
### Retaliation in Violation of the New York City Human Rights Law)

199.   Plaintiffs hereby repeat and reallege each and every allegation stated in the paragraphs above as if fully set forth herein.

200.   Defendants have retaliated against Plaintiffs and the New York Subclass in violation of the NYCHRL for their opposition to discriminatory practices directed towards them and other Employees of color and/or their participation in lodging complaints about such discriminatory practices toward themselves and other employees of color with the EEOC.

201.   As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiffs and the New York Subclass have suffered and continue to suffer monetary and/or economic harm, including but not limited to loss of past and future income, compensation and benefits for which they are entitled to an award of damages.

202.   As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiffs and the New York Subclass have suffered and continue to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which they are entitled to an award of damages.

203.    Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of the NYCHRL for which Plaintiffs and the New York Subclass are entitled to an award of punitive damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the members of the proposed class whom they seek to represent, request the following relief:

A.    Certification of the case as a class action maintainable under the Fed. R. Civ. P. 23(a), (b)(2) and/or (b)(3), on behalf of the proposed plaintiff class and subclasses and designation of Plaintiffs as representatives of this class and their counsel of record as class counsel;

B.    A declaratory judgment that Defendants' actions, conduct and practices complained of herein violate the laws of the United States and the State and City of New York;

C.    An injunction and order permanently restraining Defendants, their partners, officers, owners, agents, successors, employees and/or representatives, and any and all persons acting in concert with them, from engaging in any further unlawful practices, policies, customs, usages, and race and/or color discrimination as set forth herein;

D.    An order directing Defendants to place Plaintiffs and the members of the proposed class in the position they would have occupied but for Defendants' discriminatory, retaliatory and otherwise unlawful treatment of them, including but not limited to reinstatement of any Plaintiff or member of the proposed Class that was unlawfully terminated, as well as to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices and otherwise unlawful conduct are eliminated and do not continue to affect Plaintiffs and the members of the Class;

E.    An award of damages in an amount to be determined at trial, plus prejudgment

interest, to compensate Plaintiffs and the members of the class for all monetary and/or economic damages, including but not limited to the loss of past and future income, wages, compensation, seniority and other benefits of employment;

F.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiffs and the members of the class for all non-monetary and/or compensatory damages, including but not limited to compensation for mental anguish and emotional distress, humiliation, depression, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, and emotional pain and suffering and any other physical or mental injuries;

G.      An award of damages in an amount to be determined at trial plus prejudgment interest, to compensate Plaintiffs and the members of the class for harm to their professional and personal reputations and loss of career fulfillment;

H.      An award of punitive damages, in an amount to be determined at trial;

I.      An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiffs and the members of the class in an amount to be determined at trial, plus prejudgment interest;

J.      An award of costs that Plaintiffs and/or the class has incurred in this action, including but not limited to expert witness fees, as well as reasonable attorneys' fees and costs to the fullest extent permitted by law; and

K.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues of fact and damages stated herein.


Dated: April 27, 2010          Respectfully submitted,
       New York, New York

                               THOMPSON WIGDOR & GILLY LLP


By: _____
                         Douglas H. Wigdor (DW-9737)


                         85 Fifth Avenue, Fifth Floor
                         New York, NY 10003
                         Telephone: (212) 257-6800
                         Facsimile: (212) 257-6845


                         COUNSEL FOR PLAINTIFFS